# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-10-00262-CR

---

**Kwan Hung Ng, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. D-1-DC-08-301833, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Kwan Hung Ng of the offense of indecency with a child by contact. *See* Tex. Penal Code Ann. § 21.11(a)(1) (West 2011). Punishment was assessed at thirteen years' imprisonment and a $10,000 fine. In a single issue on appeal, Ng asserts that the district court erred in denying his motion for new trial without conducting a live evidentiary hearing. Finding no abuse of discretion in the district court's decision, we will affirm the judgment.

### BACKGROUND

Ng was charged with engaging in sexual contact with his daughter when she was younger than 17 years of age. During trial, Ng, who is not fluent in English, relied on a court-appointed interpreter, Dr. Yan Yang. Yang, who was present at Ng's arraignment, represented to the district court that he was a "Texas licensed interpreter." During the arraignment, the district court asked Ng's counsel if he had conveyed to his client a plea-bargain offer the State had recommended.

Counsel replied, "With the help of the interpreter, yes, sir, I have." The district court then asked Ng if he was accepting or rejecting the plea offer, and Ng replied that he was rejecting it. The case was then set for trial.

Several months later, immediately prior to voir dire, Ng objected for the first time to the interpreter. The basis of his objection was that Yang, according to Ng, "is not certified and his endorsement is in Mandarin only and not Cantonese," referring to two dialects of the Chinese language. Ng claimed that he spoke only the Cantonese dialect of Chinese. The district court then proceeded to question Yang as follows:

[The Court]: You have interpreted in this very case before, is that correct?

[Yang]: Yes.

[The Court]: You have also interpreted for [defense counsel] in this case before; is that right?

[Yang]: Yes, sir.

[The Court]: Mr. Ng is the accused. It is my understanding that Mr. Ng's language is Cantonese dialect.

[Yang]: Yes.

[The Court]: What is your experience in Cantonese?

[Yang]: I was brought up in Guangzhou. I speak perfect Cantonese.

[The Court]: That is the area of your origin and birth?

[Yang]: That's right.

[The Court]: Have you had any difficulties communicating with Mr. Ng on the previous occasions?

[Yang]: No.

[The Court]: Has he complained in any way about your ability to communicate with him in terms of understanding?

[Yang]: Not that I know of.

[The Court]: Would you ask [Ng] if he has any complaints about your ability?

(Interpreter complies)

[Ng]: A little bit, I not sure because I'm from Hong Kong, you are from Guangzhou.

[The Court]: Are the languages Cantonese spoken in both?

[Yang]: Some terms I know there are a little bit different but basically there is no difference of communication.

[The Court]: Other than today, this is the first time he has mentioned to you any concern about that?

[Yang]: I beg your pardon?

[The Court]: Is this the first time you have heard anything from Mr. Ng about this issue of the differences?

[Yang]: That's right.

[The Court]: We are making a record, okay.

[Yang]: Also for your reference, I have been his interpreter in municipal court at least three times.

[The Court]: On this defendant?

[Yang]: No, for other issues long time ago. There was no mention of my language competence.

[The Court]: For other people you have done—

[Yang]: For him, Mr. Ng.

[The Court]: You have interpreted for Mr. Ng in municipal court in past occasions?

3

[Yang]:          Many years.

[The Court]:     He has never complained?

[Yang]:          He never mentioned I was not able to do that.

The district court overruled Ng's objection. It explained on the record the basis for its ruling:

> One can believe this is being done for delay, but I won't even consider that as a possibility. The Court finds that you are an expert in the area of translation of English and Cantonese; that you have provided this service without complaint on many occasions for not only Mr. Ng but for his attorney, and you will be our interpreter, the Court's interpreter, for this trial in this case until some further matter is presented to the Court and I have nothing else.

The trial then proceeded without further objection from Ng on Yang's qualifications or Ng's ability to communicate with and through him. The evidence presented at trial included Ng's testimony as translated by Yang. The jury found Ng guilty as charged and assessed punishment as noted above. The district court sentenced Ng in accordance with the jury's verdict. Subsequently, trial counsel withdrew and appellate counsel was appointed.

Appellate counsel filed a motion for new trial alleging that Ng was denied due process during trial because he "speaks only the Hong Kong dialect of the Cantonese language." Ng argued that this had denied him due process in two ways. First, Ng asserted that trial counsel provided ineffective assistance by failing to provide an interpreter who could facilitate communication between himself and counsel. Second, Ng claimed that because he and Yang did not speak the same dialect, Ng "understood, at best, approximately 40% of the translation being provided, with the rate dropping dramatically when specific language was used."

4

Attached to Ng's motion were affidavits by: (1) Chuan Kim "Frank" Lai, a business acquaintance of Ng's who averred that Ng "fluently speaks only Hong Kong Cantonese," that Ng "knows a few words of Mandarin, [] even fewer words of English," "can communicate in neither" language, and that without an interpreter, trial counsel would be unable to communicate with Ng; (2) Li Wang, a certified interpreter in both the Cantonese and Mandarin languages who averred that the Cantonese language is one with multiple dialects that "differ to the extent that the Cantonese spoken by persons from one area [of China] may not be easily or fully understood by persons from another" area; and (3) Ng.

In Ng's affidavit, he averred that Yang "spoke a variant of Cantonese known as 'mainland Cantonese,' which [Ng] neither speak[s] nor understand[s] to any real degree." Ng also averred that he only understood approximately 40 percent of Yang's language and that this was only when Yang "was speaking colloquially." Ng continued, "When [Yang] would try to use precise terms to describe things, which I can only imagine was done when the speaker would become very specific, my understanding fell to almost zero. I was unable to understand large portions of the testimony and particularly the questioning because of this failure of language." Ng added that he was unable to communicate with counsel during trial "due to the lack of an interpreter."

In his motion for new trial, Ng requested a live evidentiary hearing. Asserting that the proof of his allegations "are outside the record of the trial in the instant case," Ng claimed that the district court was required to provide him with "the opportunity to introduce evidence in support of the allegations made here and in the supporting affidavits and statements."

The district court, in an "order designating issues and order for filing affidavits for motion for new trial," found that "in order to fully resolve the issues addressed in the motion," it

5

needed testimonial evidence from Stella Chiu, Ng's courtroom interpreter in a prior civil suit that had been filed against Ng by his daughter, the victim in the criminal case. Chiu subsequently provided an affidavit in which she averred that she was a licensed court interpreter in the Mandarin, Cantonese, and Shanghai dialects. Like Ng, Chiu "grew up in Hong Kong, where Cantonese is the major dialect." Cantonese was "the first dialect [she] learned." According to Chiu,

> There is no difference in the Cantonese dialect between the Hong Kong and the Guangzhou dialect because both Hong Kong and Guangzhou belong to Guangdong Province. The only difference is that the way the upper class people speak and the way the lower class people speak are somewhat different. Lower class people use more "slangs" in their speech.

> I have many friends who speak Hong Kong dialect (Cantonese) in Dallas area. We speak quite often. Also I speak Cantonese daily with my husband because he is also from Hong Kong. I also speak with my brothers and sisters in Cantonese, too. I have no difficulty understanding the speakers[,] and the speakers with the Hong Kong dialect indicate to me that they had no difficulty understanding my Cantonese.

Chiu further averred that during the civil trial, she had understood Ng's Cantonese and Ng had understood her Cantonese, although "a couple times he asked me to repeat the questions asked by the [plaintiff's] attorney." Chiu, who had also interpreted for Ng's ex-wife during the criminal trial, added that she had "understood Ms. Ng's Cantonese fully" and that Ms. Ng had "understood my Cantonese interpretation. We had no problem in understanding each other."[1]

Subsequent to the filing of Chiu's affidavit, the State filed a response to Ng's motion for new trial in which the State argued that based on the record and the evidence presented, Ng's claim "is not credible and has no merit." Attached to the State's response was: (1) information on

---

[1] Ng's ex-wife had been a witness for the State during the criminal trial.

6

the Cantonese dialect from Wikipedia and other online sources; (2) information on interpreter licensing requirements in the State of Texas, also obtained from online sources; (3) an affidavit by Yang; (4) an affidavit by Ng's ex-wife, Sek "Ann" Chan Ng; (5) Chiu's affidavit, summarized above; (6) an affidavit by trial counsel; and (7) the reporter's record of the criminal trial.

In Yang's affidavit, he averred that he is a licensed court interpreter in the Mandarin Chinese language, "was born and grew up in Guangzhou, also known as Canton, and speak[s] perfect Cantonese." Yang acknowledged that he is not "licensed to interpret in Cantonese" but has "extensive experience speaking with people who are from Hong Kong and who speak the Hong Kong Cantonese." Yang also averred that prior to coming to the United States, "I taught at Jinan University in Guangzhou, as a lecturer of English, and many of my students were from Hong Kong. I had no trouble understanding or communicating with my students." Yang added that he has traveled to Hong Kong on several occasions, that his next-door neighbor is from Hong Kong, and that he has many friends and a younger sister from Hong Kong. According to Yang, he has no difficulty communicating with native Hong Kong Cantonese speakers. He explained: "I speak Cantonese with each of these individuals with no difficulty. Neither do they have any problem communicating with me. I have also worked as an interpreter a couple of times for local law offices and insurance companies for their clients who speak Hong Kong Cantonese, and have never had any problem communicating with the client."

Yang further averred that he has interpreted for Ng in other proceedings in municipal court and that Ng "had never indicated to me that he was experiencing difficulty understanding my Cantonese." Yang continued, "During the trial of this case, on a few occasions, Mr. Ng did ask me to repeat phrases or ask for a clarification, and once the clarifications were made

7

he said nothing to me to indicate that he failed to understand." Yang added that he had understood "100% of Mr. Ng's words" and that "there were a few instances during the trial in which I heard Mr. Ng speak English words and phrases with his attorney and others."

Responding to Wang's affidavit in which Wang had claimed that were differences between the Hong Kong Cantonese and Guangzhou Cantonese dialects, Yang acknowledged that there are "some differences." However, Yang compared the differences to those between American English and Canadian English. Yang averred that "the differences have never been a problem for me to provide adequate interpretation, and should not be so for any professional Cantonese interpreters (licensed or not) to provide adequate interpretation, either." Yang also disputed Ng's claim that Ng could only understand 40 percent of Yang's translation. In Yang's view, the difference between the two dialects "will never cause 60% misinterpretation or misunderstanding." To illustrate this point, Yang referenced Ng's testimony during trial. According to Yang, Ng's answers to the questions of both defense counsel and the prosecutor "were always appropriate and on point." Yang added that he had on one occasion conversed with Ng's ex-wife on the telephone for approximately six minutes and that he had understood all of her words: "Her Hong Kong dialect presented no difficulty for me to understand."

In her affidavit, Ng's ex-wife, Ann, averred that she and Ng were both born and raised in Hong Kong and that they "speak the exact same dialect of Cantonese." Ann explained that before Ng had immigrated to the United States, he had "traveled to mainland China on several occasions and was able to adequately speak with the Chinese people there." Ann added that Ng was "a successful businessman in the Austin area" who "has many business associates who speak Mandarin Chinese," and that he "is able to converse with them and conduct business transactions in Mandarin."

8

Also, according to Ann, Ng "speaks some English and is familiar with the English phrase, 'I don't understand.' I have heard him say these words in English." Ann also referenced her telephone conversation with Yang and stated, "His Cantonese dialect presented no difficulty for me to understand."

Finally, trial counsel, in his affidavit, provided the following statements:

Dr. Yan Yang interpreted for Mr. Ng at his arraignment . . . . Mr. Ng did not indicate that he was dissatisfied with Dr. Yang's translation at that proceeding, nor that he did not understand the translator's Chinese dialect.

Mr. Ng was able to speak a few words of English, such as the days of the week, my name [], and "ok."

Prior to trial, during preparation, Mr. Lei, a business acquaintance of Mr. Ng's, would come to my office and translate.

Dr. Yang translated between me and Mr. Ng several times outside of trial testimony. I can recall Dr. Yang interpreting in at least three places: a small conference room, outside the courtroom, before court, and after court.

There were several times when Dr. Yang and Mr. Ng were conversing in Chinese, which was never translated for me. I presumed that they were discussing housekeeping matters, such as, "when is the next coffee break."

The district court, after considering the above affidavits, the State's response to Ng's motion for new trial, and its "personal recollection" from Ng's trial, denied the motion for new trial without conducting a live evidentiary hearing as requested by Ng. The district court adopted the State's proposed findings of fact and conclusions of law in their entirety. The factual findings included that the above affidavits of Yang, Chiu, Ng's ex-wife, and trial counsel were "credible," that the differences between the Cantonese spoken in Hong Kong and the Cantonese spoken in Guangzhou were "minor," and that Yang had interpreted for Ng in court on prior occasions without

9

complaint. The district court further found that Ng "did not express dissatisfaction with Dr. Yang at trial or indicate that he did not understand the proceedings. During the trial, the defendant did not say the words in English, 'I don't understand.'" Finally, the district court found that it "has not been presented with any credible evidence that the defendant did not understand the proceedings or that he was unable to communicate with his defense counsel."

Based on the above findings, the district court concluded that Ng: (1) "was provided with a constitutionally adequate interpreter, and he was thus not deprived of the effective assistance of counsel"; and (2) "was not denied due process or due course of law because the translation services he was provided were more than adequate for him to understand the proceedings and assist in his defense."

In his sole issue on appeal, Ng asserts that the district court erred in not conducting a live hearing prior to ruling on the motion for new trial. In Ng's view, "the trial court's reliance upon competing affidavits without a full inquiry deprived the trial court of a fair opportunity to resolve the facts of the claims and deprived appellant of a meaningful opportunity to develop the critical facts for appellate review." The State argues in response that no live evidentiary hearing was necessary in this case because the issues were determinable from the record and Ng's affidavits were conclusory and did not show that he could be entitled to relief.

## STANDARD AND SCOPE OF REVIEW

When examining a trial court's denial of a hearing on a motion for new trial, we review for an abuse of discretion. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2008); *Wallace v. State*, 106 S.W.3d 103, 106 (Tex. Crim. App. 2003). We will reverse the denial of a

hearing on a motion for new trial only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Smith*, 286 S.W.3d at 339; *see also Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004) (clarifying that trial court abuses its discretion only when no reasonable view of record could support trial court's ruling); *State v. Gonzalez*, 855 S.W.2d 692, 696 n.4 (Tex. Crim. App. 1993) (noting that reviewing court "is not to substitute its judgment for that of the trial court, but rather must decide whether the trial court's decision was arbitrary or unreasonable").

The purposes of a new trial hearing are (1) to determine whether the case should be retried or (2) to complete the record for presenting issues on appeal. *Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009) (citing *Smith*, 286 S.W.3d at 338). Such a hearing is not an absolute right. *Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993). "But a trial judge abuses his discretion in failing to hold a hearing if the motion and accompanying affidavits (1) raise matters which are not determinable from the record and (2) establish reasonable grounds showing that the defendant could potentially be entitled to relief." *Hobbs*, 298 S.W.3d at 199. Thus, our review is limited to the trial judge's determination of whether the defendant has raised grounds that are both undeterminable from the record and reasonable. *Smith*, 286 S.W.3d at 340. Only if the defendant has satisfied both requirements does the trial court abuse its discretion in failing to hold a live hearing. *See id*.

**ANALYSIS**

**Whether the grounds are undeterminable from the record**

We first address the requirement that Ng raise grounds that are undeterminable from the record. The grounds that Ng raised were that he was denied due process during trial because (1) he could not effectively communicate with his lawyer through the interpreter and (2) he could only understand approximately 40 percent of the translation that the interpreter provided.

Regarding the first claim, the district court would not have abused its discretion in finding that this ground was determinable from the record. The record shows that during Ng's arraignment, counsel was able to communicate with his client, including conveying to Ng the State's plea offer. The offer was fairly detailed: 10 years probation, 180 days shock probation, 200 hours community service restitution, sex offender counseling, sex offender registration, no contact with the victim, and paying for the counseling of the victim. When asked if he had conveyed this offer to his client, counsel replied, "With the help of the interpreter, yes, sir, I have." The district court also asked Ng if this was his understanding of the State's plea offer. Ng replied, "Yes." The district court then asked Ng whether his decision was to accept or reject the plea offer. Ng answered, "Reject it." At no point during the arraignment did Ng express an inability to understand either counsel, the district court, or his interpreter. Counsel, in his affidavit, recalled, "Mr. Ng did not indicate that he was dissatisfied with Dr. Yang's translation at that proceeding, nor that he did not understand the translator's Chinese dialect."

The record also demonstrates that during his trial testimony, Ng was able to understand the questions asked of him by counsel and provide appropriate answers to counsel's

12

questions.[2] At no point during his testimony did Ng indicate that he was unable to understand counsel. In fact, the record reflects that at one point during redirect, Ng was able to communicate to counsel that he wanted to elaborate on the testimony he had just provided. When counsel attempted to move on to a different subject, Ng interjected, "I still have more to say concerning what I saw that morning." Counsel responded, "Okay. Say more." Ng then proceeded to elaborate on his testimony. Additionally, counsel explained in his affidavit that Yang had translated for them "several times outside of trial testimony," including in "a small conference room, outside the courtroom, before court, and after court."

The district court also would not have abused its discretion in finding that Ng's claim that he could not understand the majority of Yang's translation was determinable from the record. In addition to the above evidence, the record further shows that the district court conducted a hearing prior to voir dire in which it inquired of Yang's ability to communicate with Ng. Yang testified during this hearing that he speaks "perfect Cantonese," that he has interpreted for Ng on prior occasions, both in this proceeding and in municipal court "at least three times," and that

---

[2] The following exchange illustrates Ng's understanding:

Q: Mr. Ng, you heard the testimony of your daughter, [Y.N.]?

A: Yes.

Q: The things that she said regarding you touching her sexually, are those things true or false?

A: Not true.

Q: Did you ever take her hand and put it on your sex organ?

A: Absolutely no.

Ng had never complained in the past about his ability to understand Yang's translation. When the district court asked Ng if he had any complaints about Yang's ability, Ng replied, "A little bit, I not sure because I'm from Hong Kong, you are from Guangzhou." In response, Yang acknowledged that "some terms" were "a little bit different" but that "basically there is no difference of communication."[3] Moreover, the district court was able to personally observe Ng throughout the entire trial and evaluate the degree to which Ng was understanding the proceedings and Yang's translation.[4]

---

[3] Ng criticizes Yang's testimony during this hearing as "self-serving," but the district court would not have abused its discretion in finding Yang's testimony credible and in discounting Ng's testimony that he was "not sure" of Yang's translation abilities, particularly in light of Ng's failure to raise the issue either during his arraignment or at any other time in the months preceding trial.

[4] In fact, the record shows that Ng and the district court communicated to each other through the translator on multiple occasions without any apparent difficulty. In addition to informing the district court during arraignment that he was rejecting the State's plea offer and later informing the court that he was pleading not guilty to the charges against him, the following exchange occurred after the district court announced the jury's verdict on punishment:

[Ng]:          I want to appeal.

[The Court]:   Okay. It is so noted.

[Ng]:          But I already filed bankruptcy. I don't have any money. I want the
               Court to appoint attorney for me.

[The Court]:   You will be entitled to that, and [counsel] will get some papers filled
               out. . . . Anything else?

[Ng]:          I don't know how I can raise $10,000 to pay the fine because I don't
               have money, Your Honor.

[The Court]:   Okay. That's an issue you address later. . . .

The district court was also able to review from the record before it the affidavits of Ng, Wang, Lai, Yang, Chiu, trial counsel, and Ng's ex-wife, the contents of which we have summarized above. From these competing affidavits (five of which were provided by individuals whom the district court had personally observed during Ng's trial either as parties, representatives, or witnesses),[5] the district court could further determine the merits of Ng's claim. *See Holden v. State*, 201 S.W.3d 761, 764 (Tex. Crim. App. 2006) (holding that it was not abuse of discretion for trial court to decide merits of motion for new trial based on competing affidavits, particularly when trial court had prior opportunity to evaluate demeanor and credibility of affiants or was familiar with case); *Scaggs v. State*, 18 S.W.3d 277, 281 (Tex. App.—Austin 2000, pet. ref'd) ("It has long

Additionally, the following exchange during Ng's cross-examination demonstrates that Ng was also able to understand and respond to the prosecutor's questions:

Q: Do you agree with me that you and your wife purchased that warehouse we have seen pictures of on January 28, 2004?

A: That was the time we moved in. The time we purchased it and remodeling it was in July to August 2003.

Q: Okay. So it was actually purchased in July of '03, and you moved in in January of '04. Is that your testimony?

A: Yes, purchased between July and August.

Q: But you moved in in January of 2004?

A: More or less around that time.

[5] Ng, Yang, trial counsel, Ng's ex-wife, who had testified for the State during trial, and Chiu, who had translated for Ng's ex-wife during her trial testimony and who also briefly testified during trial as to her qualifications.

15

been held that a trial court may decide a motion for new trial based on sworn pleadings and affidavits admitted in evidence without hearing oral testimony.").[6]

In summary, during Ng's arraignment and throughout trial, the district court personally observed Ng's understanding of the proceedings and Ng's ability to communicate with counsel, the interpreter, and the court; heard live testimony from Yang regarding his ability to translate Ng's language and his having done so on prior occasions without complaint from Ng; and considered several affidavits specifically addressing the issues raised in Ng's motion for new trial. On such a record, we cannot conclude that the district court abused its discretion in finding that Ng failed to raise grounds that are undeterminable from the record.[7]

---

[6] Ng cites to several cases in his brief for the proposition that reliance on competing affidavits is a disfavored method of resolving "complex factual issues" that involve credibility determinations. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 82 n.25 (1977); *California v. Green*, 399 U.S. 149, 158 (1970); *Morse v. State*, 29 S.W.3d 640, 641-42 (Tex. App.—Beaumont 2000, no pet.). None of these cases, however, hold that a live hearing is required in every case involving credibility determinations. In fact, other cases hold to the contrary. *See, e.g.*, *Holden v. State*, 201 S.W.3d 761, 764 (Tex. Crim. App. 2006); *Manzi v. State*, 88 S.W.3d 240, 242-44 (Tex. Crim. App. 2002). The district court would not have abused its discretion in finding the present case to be one that does not involve "complex factual issues" such that a live hearing on the motion for new trial was necessary. Additionally, this is not a case in which the district court relied solely on affidavits. As it stated in its findings of fact and conclusions of law, the district court also relied on its "personal recollection" of the trial, which included its observations of Ng and the prior live testimony of the interpreter regarding his translation abilities.

[7] Ng also points to various "conflicts" between statements in his affidavits and statements in the State's affidavits and claims that a live hearing was necessary to resolve such conflicts. The State responds that Ng "exaggerates the differences between the affidavit testimonies." We agree with the State. Only Ng's own affidavit, in which he claims that he could not understand Yang, actually conflicts with the State's affidavits disputing that claim. The district court could have reasonably found that were no conflicts of material facts between the other affidavits provided by Ng and the State's affidavits. To the extent that there are conflicts between the statements in Ng's own affidavit and the statements in the State's affidavits, the district court would not have abused its discretion in resolving such conflicts in the State's favor without hearing oral testimony, particularly in light of the fact that the district court had already personally observed Ng and the

**Whether the grounds are reasonable**

We next address the requirement that Ng raise grounds that are reasonable, meaning that they could entitle him to relief. This requirement is designed to limit and prevent hearings from becoming "fishing expeditions." *Hobbs*, 298 S.W.3d at 199; *Smith*, 286 S.W.3d at 339. To satisfy this requirement, a new-trial motion must be supported by an affidavit or affidavits specifically setting out the factual bases for the claims. *Hobbs*, 298 S.W.3d at 199; *Smith*, 286 S.W.3d at 339. The affidavits need not establish a prima facie case, or even reflect every component legally required to establish relief. *Smith*, 286 S.W.3d at 339. But affidavits that are conclusory in nature and unsupported by facts do not provide the requisite notice of the basis for the relief claimed; thus, no hearing is required. *Id*.

To be entitled to relief on the claims presented in his motion for new trial, Ng would need to demonstrate that he was unable to "sufficiently understand the proceedings against him such that he is able to assist in his own defense." *See Linton v. State*, 275 S.W.3d 493, 504 (Tex. Crim. App. 2009). "The question on appeal is not whether the 'best' means of interpretive services were employed, but whether the services that were actually employed were constitutionally adequate such that the defendant could understand and participate in the proceedings." *Id*. at 500.

Here, the district court would not have abused its discretion in finding that Ng's affidavits were unsupported by facts showing that he could be entitled to relief. In the affidavit provided by Lai, Ng's business acquaintance, Lai averred that Ng "fluently speaks only Hong Kong

---

State's affiants during trial and thus was able to evaluate and assess their credibility. *See Holden*, 201 S.W.3d at 764.

Cantonese" and that, "without an interpreter," trial counsel "was unable to communicate in any manner whatsoever with Mr. Ng." But nothing in Lai's affidavit suggests that the interpreter who had been provided to Ng did not understand Hong Kong Cantonese or otherwise could not communicate with Ng during trial. In fact, Lai averred that he was in China during trial. Thus, he had no personal knowledge of the interactions between Ng, Yang, and counsel during trial or whether there were any actual communication difficulties. Similarly, in the affidavit provided by Wang, Ng's language expert, Wang did not indicate that he had any personal knowledge of the translation that was provided to Ng during trial. Rather, he speculated that a Hong Kong Cantonese speaker "could" have difficulty understanding another Chinese speaker with a different dialect and that the dialects differ to the extent that the Cantonese spoken by persons from one area "may" not be easily or fully understood by persons from another. Wang did not provide any specific examples of the words or phrases that could cause difficulty and also admitted that he "cannot give a percentage of compatibility between any two dialects."

The district court also could have found Ng's own affidavit to be conclusory and unsupported by facts. Ng averred that he "understood the interpreter's language to a level [he] would estimate at 40%," but he pointed to no specific instances in the record where he could not understand what was being said or could not communicate with counsel or the court. To the contrary, as we explained above, the record demonstrates that Ng understood the proceedings and was able to communicate through Yang with counsel, the prosecutor, and the district court. Moreover, Ng fails to address in his affidavit Yang's testimony that he had translated for Ng both in this proceeding and in prior proceedings in municipal court without complaint. For these reasons, the district court

18

would not have abused its discretion in finding that Ng's affidavits were conclusory and unsupported by facts showing that Ng could not understand and participate in the proceedings.

Finally, Ng also asserts that various fact-finding procedures utilized by the district court in determining his motion for new trial were "procedurally unreasonable" and denied him due process, including: adopting the State's proposed findings in their entirety; considering Chiu's affidavit, which, Ng asserts, was neither signed nor notarized; relying on online sources such as Wikipedia "without making any underlying determination of whether [they] are reliable and accurate"; misstating "material facts from the trial record"; and not considering the possibility that Ng might have refrained from further complaining during trial about Yang's translation abilities due to the district court's earlier comment that Ng's pretrial objection may have been "done for delay."

We do not find that any of the procedures utilized by the district court denied Ng due process. There is no rule prohibiting the district court from adopting the State's proposed findings and conclusions, so long as they are supported by the record. We have reviewed the district court's findings and conclusions and find all of them to be supported by the record; we do not find that they contain any "misstatements of material fact" as alleged by Ng. As for the evidence considered by the district court, we find no abuse of discretion in the district court's consideration of Chiu's affidavit or the online sources. Contrary to Ng's assertion, a signed and notarized copy of Chiu's affidavit can be found in the clerk's record. As for the online sources, only two of the district court's numerous findings reference these sources. The majority of the findings are instead supported by either affidavit testimony or the district court's personal recollection of the trial proceedings. We also note that Ng objected only to the reliability of Wikipedia, which was indirectly

19

referenced in only one of the district court's findings (a "see also" citation). Ng never objected to the reliability of the other online sources submitted by the State, including those relating to the interpreter licensing requirements that the district court referenced in one of its findings. *See* Tex. R. App. P. 33.1. Finally, there is no indication in the record that Ng refrained from complaining about the interpreter during trial because of the district court's earlier comment regarding delay. And, even if he did, the undisputed fact remains that Ng did not complain of an inability to understand Yang either during his arraignment or in the prior municipal court proceedings.

We cannot conclude on this record that the district court abused its discretion in denying Ng a live hearing on his motion for new trial. We overrule his sole issue on appeal.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   July 27, 2011

Do Not Publish